**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:21-cr-151 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| WALTER RODGERS, | : | |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER GRANTING DEFENDANT WALTER RODGERS'
MOTION TO SUPPRESS EVIDENCE & STATEMENTS (DOC. NO. 18)**

---

This case is before the Court on the Motion to Suppress Evidence & Statements (Doc. No. 18) (the "Motion") filed by Defendant Walter Rodgers ("Rodgers"). Rodgers asks this Court "to suppress any and all evidence seized from his automobile, in addition to any statements he made in relation to the above-captioned matter." (Doc. No. 18 at PageID 48.) The Court held an evidentiary hearing for the Motion on March 30, 2022. (Doc. No. 26.) Rodgers then filed a post-hearing brief in support of the Motion (Doc. No. 27), the United States of America ("the Government") filed a post-hearing brief in opposition (Doc. No. 28), and Rodgers filed a reply brief in support of the Motion (Doc. No. 29). The matter is ripe for review. For the reasons discussed below, the Court **GRANTS** the Motion.

**I.** **FACTUAL FINDINGS**

The following findings are made based on the evidence submitted by the parties and the testimony at the March 30, 2022 hearing.

**A. The Police Officers Park Behind Rodgers' Vehicle and Exit Their Marked Cruiser**

At approximately 9:00 p.m. on November 6, 2021, Dayton Police Department officers

1

Christopher Bartley ("Officer Bartley") and Jason Bryant ("Officer Bryant") were patrolling the Germantown area of Dayton near Gina's Liquor Store ("Gina's"). (Doc. No. 26 at PageID 72-74.) Officer Bartley testified that the area is a "high crime area" and a very dangerous neighborhood. (*Id.*) The two officers were in a marked police cruiser, driven by Officer Bartley with Officer Bryant in the passenger seat. (*Id.*; Govt. Exh. 4A (clip from Officer Bartley's body camera video).)

Officer Bartley drove the police cruiser from the street into Gina's parking lot. (Govt. Exh. 3A (police cruiser dashboard camera video).) The officers observed a black Chevy Impala (the "Vehicle") in the parking lot. (Doc. No. 26 at PageID 74-76, 104.) Officer Bryant ran the Vehicle's license plate, and the results indicated that its registered owner had been charged with murder in 2020 and had been the subject of "numerous field interviews for firearms." (*Id.*) Rodgers was in the Vehicle's driver's seat and Eric Wilson ("Wilson") was in its passenger seat. (*Id.* at PageID 77-78.)

While Officer Bartley drove through Gina's parking lot, the Vehicle illuminated its backup lights and began the process of backing out of a parking spot. (Govt. Exh. 3A; Doc. No. 26 at PageID 115-16.) Without activating the marked police cruiser's emergency overhead lights or siren, Officer Bartley drove behind the Vehicle and parked his cruiser approximately five feet behind the Vehicle, slightly off-center from being perpendicular. (Doc. No. 26 at PageID 76, 86, 98; Govt. Exh. 4A.) The Vehicle stopped; it had not backed up very far, if at all. (Govt. Exh. 3A.; Govt. Exh. 4A.) To the immediate left of the Vehicle was another car; directly in front of it was a cement parking block (and then the liquor store); to the immediate right of it was an open parking spot. (Govt. Exh. 4A; Govt. Exh. 1 (picture of Gina's).) Officer Bartley acknowledged that there were other places where he could have parked the police cruiser instead of behind the Vehicle, including in a parking space. (Doc. No. 26 at PageID 95-96.) Both Officer Bartley and Officer

2

Bryant testified that, despite having parked the police cruiser approximately five feet behind the Vehicle, the Vehicle had a "clear out" to back up and depart the parking lot if so desired. (*Id.* at PageID 76, 98, 116.)

Both officers, dressed in their police uniforms, then exited the marked police cruiser and began approaching the passenger's side of the Vehicle on foot. (Govt. Exh. 4A; Doc. No. 26 at PageID 103.) Officer Bartley testified that the purpose of stopping the police cruiser behind the Vehicle and approaching Rodgers was <u>not</u> to question him because of the "murder FI" that the officers had discovered through running the license plate; instead, the purpose was just to talk with Rodgers. (Doc. No. 26 at PageID 97.) Officer Bartley admitted that Rodgers had not committed any crime at that point. (*Id.*) Officer Bartley also testified that he did not intend to prevent Rodgers from departing the scene by parking the police cruiser where he did. (*Id.* at PageID 99-100.)

**B. The Police Officers Observe a Handgun Behind the Vehicle's Passenger Seat, Order Rodgers Out of the Vehicle, Detain Him, and Search the Vehicle**

As Officer Bryant began speaking to the Vehicle's occupants from the passenger's side, Officer Bartley walked around the rear of the Vehicle, approached its driver's side, and "identified a black handgun in the pocket of the rear passenger seat" when he looked through the Vehicle's window with his flashlight. (Govt. Exh. 4A; Doc. No. 26 at PageID 76.) Officer Bartley immediately communicated this discovery to Officer Bryant. (Doc. No. 26 at PageID 77.) Officer Bartley testified that, "[u]ntil the firearm was located, [Rodgers] was free to leave." (*Id.* at PageID 99.)

It was at this point that the officers ordered both occupants to exit the Vehicle. (Doc. No. 26 at PageID 78; Def. Exh. D (lengthier clip from Officer Bartley's body camera video).) As Wilson exited the Vehicle, Officer Bartley observed an opened bottle of alcohol on the floorboard of the front passenger side. (Doc. No. 26 at PageID 78; Govt. Exh. 4C (clip from Officer Bartley's

3

body camera video).) Officer Bartley patted down Rodgers and observed an empty black gun holster on Rodgers' right hip. (Doc. No. 26 at PageID 78.) Rodgers was handcuffed and detained in the back seat of the police cruiser. (*Id.* at PageID 78-79.) After Wilson was detained in a separate cruiser, Officer Bryant read Rodgers his *Miranda* rights from the officer's issued *Miranda* card provided by the police department, and Rodgers indicated that he understood those rights. (*Id.* at PageID 79, 109.) Officer Bartley then conducted an inventory search of the Vehicle, during which the handgun and opened bottle of alcohol were retrieved and inventoried. (*Id.* at PageID 79-80.)

It was "subsequently determined" that the Vehicle's rear license plate was obstructed. (Doc. No. 28 at PageID 143; *see also* Def. Exh. D; Govt. Exh. 5 (traffic citation); Doc. No. 26 at PageID 114.) Officer Bryant issued Rodgers a citation for having an obstructed license plate in violation of Ohio Rev. Code § 4503.21, and Rodgers pleaded guilty to the traffic citation on December 22, 2021. (Doc. No. 26 at PageID 113-14; Govt. Exh. 6 (Dayton Municipal Court Appearance, Plea of Guilty and Waiver).)

After having detained Rodgers in the back seat of the police cruiser and reading him his *Miranda* rights, officers took Rodgers to jail. (Doc. No. 26 at PageID 93.) They located a black holster in the rear seat area of Officer Bartley's police cruiser (where Rodgers had been sitting) after depositing Rodgers at the jail. (*Id.* at PageID 93-94, 111.) Pursuant to a Dayton Police Department general order, the Vehicle was impounded, towed, and its contents inventoried. (*Id.* at PageID 112-13; Govt. Exh. 8 (DPD policy for impounding vehicles).)

### C. Indictment and Arraignment

On December 14, 2021, the Grand Jury returned a single-count indictment against Rodgers in this case. (Doc. No. 15.) The count charges Rodgers with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*Id.*) On December 29, 2021,

Rodgers appeared for arraignment on the indictment and entered a plea of not guilty to the count. (12/29/2021 Minute Entry.)

## II. ANALYSIS

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

By way of the Motion, Rodgers asks the Court to "issue an Order suppressing all evidence and statements gleaned from Mr. Rodgers on or about November 6, 2021." (Doc. No. 27 at PageID 131.) He argues that the interaction with police in Gina's parking lot "was a *Terry* temporary detention" and "[t]he record is devoid of any articulable facts that give rise to reasonable suspicion Mr. Rodgers and Mr. Wilson were involved in criminal activity." (*Id.* at PageID 137-38.) According to Rodgers, the evidence demonstrates that the police officers blocked his Vehicle from backing out of the parking lot, detained him without a warrant or reasonable suspicion of wrongdoing, and, therefore, violated his Fourth Amendment rights such that "[a]ny evidence gleaned from the search of the [V]ehicle should be suppressed along with any statement made by" him. (*Id.* at PageID 139.)

In response, the Government argues that the police officers did not block the Vehicle from leaving; their initial encounter with Rodgers was consensual; "[t]his encounter only turned non-consensual once Officer Bryant observed the handgun in plain view sticking out from the rear pocket of the front passenger's seat"; at that point, "reasonable, articulable suspicion existed to proceed with an investigative stop and detention pursuant to *Terry*"; the subsequent warrantless search of the vehicle was justified under the plain view doctrine and the automobile exceptions to the Fourth Amendment; and Rodgers' subsequent detention and arrest authorized the vehicle's

5

inventory search, such that the inevitable discovery and inventory search exceptions to the Fourth Amendment apply. (Doc. No. 28 at PageID 147, 151, 153.)

### A. Consensual Encounter Analysis

The first issue presented is whether the warrantless encounter between the police officers and Rodgers was a consensual encounter.

#### 1) Constitutional principles

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Thus, unreasonable warrantless seizures violate a citizen's rights under the Fourth Amendment. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* at 554.

"A warrantless seizure is presumptively unreasonable, but the Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." *United States v. Jones*, 562

F.3d 768, 772 (6th Cir. 2009) (internal quotation marks omitted and alteration adopted). Regarding the first category, "[a] consensual encounter occurs when a reasonable person would feel free to terminate the encounter." *United States v. Carr*, 674 F.3d 570, 572-73 (6th Cir. 2012) (internal quotation marks omitted). "[U]nless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave." *Id.* at 573.

However, "a consensual encounter becomes a seizure when[,] 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 562 F.3d at 772 (quoting *Mendenhall*, 446 U.S. at 554). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.[1] "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553 (determining that the defendant "was not seized simply by reason of the fact that the [federal] agents approached her [as she walked through an airport concourse], asked her if she would show them her ticket and identification, and posed to her a few questions").

"[T]he test for the existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "A police officer may make a seizure by a show of authority and without

---

[1] The Sixth Circuit Court of Appeals in *Carr* used these same examples as examples of "coercive behavior" that would make an encounter non-consensual. *Carr*, 674 F.3d at 574.

7

the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 262.

### 2) Application

Here, the Court finds that the encounter was not consensual and that Rodgers was seized (at least) at the time the officers parked their marked cruiser and started to approach the Vehicle on foot. At that time, Rodgers' freedom of movement was restrained by means of physical force or a show of authority. *Mendenhall*, 446 U.S. at 553. In view of the circumstances, the Court finds that a reasonable person in Rodgers' position at that time "would have believed that he was not free to leave." *Jones*, 562 F.3d at 772. As the Vehicle's lights indicated it was backing up, the marked police cruiser pulled up and parked a mere five feet behind the Vehicle, despite there being open places to park in the immediate vicinity; and, two uniformed police officers exited the cruiser and immediately started approaching the Vehicle on foot. (Govt. Exh. 3A; Govt. Exh. 4A; Doc. No. 26 at PageID 76, 86, 95-96, 98, 103, 115-16.)

Contrary to the Government's assertions, the Vehicle was effectively blocked by the police. *See Jones*, 562 F.3d at 771. The Court finds that Officer Bartley parked the marked police cruiser in a manner that did not allow Rodgers to leave.[2] *Carr*, 674 F.3d at 573. In *Jones*, the Sixth Circuit held that a vehicle containing the defendant was "hemmed in" where one unmarked police vehicle parked two or three feet in front of it and another unmarked police vehicle pulled up within four

---

[2] Given this finding, the Court need not find that there was "other coercive behavior" in order to conclude that the encounter was not consensual. *Carr*, 674 F.3d at 573 ("[u]nless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave").

or five feet of it. *Jones*, 562 F.3d at 771. The court found that "by blocking in the [vehicle], the officers had communicated to a reasonable person occupying the [vehicle] that he or she was not free to drive away." *Id.* at 772. The court explained that the vehicle's "occupants' reasonable apprehension that their freedom of movement was restrained was based ostensibly on the manifest physical obstruction of the [vehicle], not on an unambiguous show of law enforcement authority." *Id.* at 773 n. 2.

Here, as in *Jones*, the Vehicle was hemmed in, with a cement parking block in front of it, another car to its immediate left, and the police cruiser within approximately five feet behind it. (Govt. Exh. 4A; Govt. Exh. 1; Doc. No. 26 at PageID 98.) The Court finds that, "by blocking in [the Vehicle], the officers had communicated to a reasonable person occupying [the Vehicle] that he or she was not free to drive away." *Jones*, 562 F.3d at 772. In other words, the "manifest physical obstruction" of the Vehicle resulted in its "occupants' reasonable apprehension that their freedom of movement was restrained." *Id.* at 773 n. 2.

This contrasts with the situation in *Carr*, a case relied on by the Government, where the Sixth Circuit held that the encounter was consensual (not a seizure). *Carr*, 674 F.3d at 571-72. In *Carr*, the officers parked their unmarked vehicle approximately 12 feet from the front of the defendant's vehicle, such that the defendant "could have driven forward past the [unmarked police vehicle] or, alternatively, could have backed out of the open carwash bay." *Id.* The Sixth Circuit in *Carr* explained that "[t]he angle of the police vehicle gave [defendant] sufficient room to drive either forward or backward out of the carwash bay" and that, "[a]lthough pulling forward would have required some maneuvering for [defendant] to get around the [unmarked police vehicle], there was enough room that [defendant] could have just merely steered around the [unmarked police vehicle]." *Carr*, 674 F.3d at 573 (internal quotation marks omitted). The situation here is

9

much closer to the one presented in *Jones* than in *Carr*, and the video shows that Rodgers could not have "just merely steered around" the cruiser. (*See* Govt. Exh. 4A; Def. Exh. D.) This case is "one in which an officer use[d] his cruiser to physically obstruct an individual's ability to depart the scene of the encounter by car." *United States v. Pettis*, 591 F. App'x 393, 396 (6th Cir. 2014) ("[b]ecause the gray Concorde was not hemmed in, blocked, or otherwise obstructed by the police cruiser, the mere fact that the officers parked behind the sedan did not, without more, indicate that Pettis had been seized") (internal quotation marks omitted); *see also United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (no consensual encounter; "when Officer Williams blocked the car in, he began an investigatory *Terry* stop").

Additionally, Rodgers submitted to the officers. *Jones*, 562 F.3d at 774 ("the driver and other passenger in the [car] were, by virtue of their passive acquiescence, effectively seized when the police vehicles hemmed in the [car]"); *Brendlin*, 551 U.S. at 254, 262 (defendant submitted by stopping his car and staying inside it). The video indicates that Rodgers was attempting to exit the parking space in the Vehicle, but stopped and remained in his seat once the marked police cruiser blocked him in and the two uniformed officers exited the cruiser and started approaching. (Govt. Exh. 3A; Govt. Exh. 4A.)

Whether the officers had any intention of preventing Rodgers from leaving or doing more than simply asking Rodgers some questions does not affect this finding. As set forth above, the test is an objective one. *Jones*, 562 F.3d at 772; *see also Brendlin*, 260-61 ("seizure requires a purposeful, deliberate act of detention," but "[t]he intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted") (internal quotation marks omitted and alteration adopted).

### B. *Terry* Analysis

As shown above, the Court has found that the encounter was not consensual and Rodgers

10

was seized (at least) at the time the officers parked their marked cruiser and started to approach the Vehicle on foot. *Jones*, 562 F.3d at 772-73 ("by blocking in the [defendant's vehicle], the officers had communicated to a reasonable person occupying the [vehicle] that he or she was not free to drive away" so, "in this respect, a warrantless 'seizure' had occurred at the time the [vehicle] was hemmed in by the unmarked police vehicles") (emphasis removed). The next question is whether, <u>at that time</u>, "a brief investigatory *Terry* stop was justified by reasonable suspicion." *Jones*, 562 F.3d at 773.

### 1) Constitutional principles

As set forth above, a second category of permissible, warrantless encounters is "a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion." *Jones*, 562 F.3d at 772; *see also Carr*, 674 F.3d at 574 ("[o]nce a consensual encounter escalates to the point where the individual is seized, the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment") (internal quotation marks omitted). "In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that an officer may conduct a brief investigatory stop of a person without a warrant if the officer has reasonable articulable suspicion that criminal activity is afoot." *Jones*, 562 F.3d at 773; *see also United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) (under *Terry*, "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances"). "[I]narticulate hunches" and "subjective good faith" are insufficient; "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21-22. Additionally, "[t]he stop and inquiry must be reasonably related in scope to the justification for

11

their initiation." *Bentley*, 29 F.3d at 1075 (internal quotation marks omitted).

"Whether a temporary investigative detention is justified by such a reasonable suspicion requires consideration of the totality of the circumstances." *Jones*, 562 F.3d at 773. "[T]he time of day and the fact that [the location] was a high-crime area, standing alone, are insufficient to support reasonable suspicion." *Carr*, 674 F.3d at 575. "The officer must have a particularized and objective basis for suspecting wrongdoing, but the likelihood of criminal activity need not rise to the level of probable cause." *Jones*, 562 F.3d at 773. "Absent reasonable suspicion, such a brief investigatory seizure is impermissible and any evidence derived from the seizure would be subject to suppression." *Id.*

### 2) Application

The Court finds that, at the time that the police officers parked their marked cruiser and started to approach the Vehicle on foot (which is the relevant time), a brief investigatory *Terry* stop was <u>not</u> justified by reasonable suspicion. *Jones*, 562 F.3d at 773 (courts "evaluate whether reasonable suspicion existed at the point of seizure"). Officer Bartley admitted that Rodgers had not committed any crime at that point. (Doc. No. 26 at PageID 97.) He also testified that, "[u]ntil the firearm was located, [Rodgers] was free to leave." (*Id.* at PageID 99.) The evidence does not show that, considering the totality of the circumstances, either police officer had "reasonable articulable suspicion that criminal activity [was] afoot." *Jones*, 562 F.3d at 773; *see also Gross*, 662 F.3d at 400 (police officer "did not have a particularized and objective basis for suspecting [defendant] of criminal activity at the top of the stop"; officer admitted that, at the time he exited his car and approached defendant's car that he had blocked in, "it was safe to say that he was not aware that there was any crime being committed") (internal quotation marks omitted and alterations adopted). Because the police officers were "unable to articulate a reasonable suspicion for the investigative stop, it constituted an unlawful seizure of" Rodgers. *Gross*, 662 F.3d at 401.

12

The Government seems to acknowledge this point in its brief when it says that the point at which "reasonable, articulable suspicion existed to proceed with an investigative stop and detention pursuant to *Terry*" was when "Officer Bryant observed the handgun in plain view sticking out from the rear pocket of the front passenger's seat." (Doc. No. 28 at PageID 153.)

Given the circumstances at the time of the unlawful seizure, none of the Government's cited exceptions to the warrant requirement are applicable.[3] (*See* Doc. No. 28 at PageID 147-50; Doc. No. 29 at PageID 157.) The automobile exception does not apply because, at the time of the seizure, there was no probable cause to believe that the Vehicle contained evidence of a crime. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) ("[u]nder the automobile exception, police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime") (internal quotation marks omitted). The plain view exception does not apply because (among other potential reasons) the officers had violated the Fourth Amendment in arriving at the place where the evidence could be plainly viewed. *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 563 (6th Cir. 2018) ("[t]he plain-view exception … applies only when the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed"); *see also United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) ("[u]nder ordinary circumstances, the plain view exception permits the warrantless seizure of an object provided that (1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and,

---

[3] This is assuming that the Government is even arguing that the cited exceptions apply if—as the Court has now found—the encounter was not consensual and a *Terry* stop was not justified by reasonable suspicion at the time that the police officers parked their marked cruiser and started to approach the Vehicle on foot. (*See* Doc. No. 28 at PageID 153 (Government arguing in its response brief that, <u>after</u> Officer Bartley had observed the handgun sticking out from the rear pocket of the passenger's seat, the automobile exception and the plain view exception legally justified "[t]he subsequent warrantless search of the [Vehicle]" and that Rodgers' "subsequent detention and arrest authorized the motor vehicle's impoundment[] and inventory of its contents pursuant to established DPD policy" because of the inventory search exception and inevitable discovery exception).)

(3) the officer has a lawful right of access to the object itself"). Similarly, the inventory search exception does not apply because the officers had violated the Fourth Amendment before they conducted the inventory; the evidence does not support a finding that they were in lawful custody of the Vehicle. *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) ("where the police are in <u>lawful</u> custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria") (emphasis added); *see also Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (the justification for the inventory search exception, which allows police to inventory the items in the arrestee's personal possession and car, is the need to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger"). Finally, the inevitable discovery doctrine does not apply. *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (the inevitable discovery doctrine operates (1) "when there is an independent, untainted investigation that was bound to uncover the same evidence" or (2) "other compelling facts demonstrate that discovery was inevitable") (internal quotation marks omitted). There is no showing that the evidence was bound to have been uncovered by an independent, untainted investigation or that "other compelling facts demonstrate that discovery was inevitable." *Id.* (the government bears the burden of showing that the inevitable discovery exception applies).

    C. <u>Exclusionary Rule</u>

The Court now must consider whether evidence seized during searches following the unlawful seizure should be suppressed in accordance with the exclusionary rule.

The exclusionary rule "often requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 579 U.S. 232, 237 (2016). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous

tree.'" *Id.* (internal quotation marks omitted). Due to the "significant costs of this rule," it is "applicable only where its deterrence benefits outweigh its substantial social costs." *Id.* (internal quotation marks and ellipsis omitted). Yet, "[i]n order to deter unlawful seizures," courts "generally suppress otherwise admissible evidence obtained as a result of an illegal seizure." *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003); *see also Jones*, 562 F.3d at 773 ("[a]bsent reasonable suspicion, such a brief investigatory seizure is impermissible and any evidence derived from the seizure would be subject to suppression"). The Supreme Court has said that suppression of evidence "has always been our last resort, not our first impulse," and it has "accordingly recognized several exceptions to the [exclusionary] rule." *Strieff*, 579 U.S. at 237-38 (internal quotation marks omitted).

None of the exceptions to the exclusionary rule apply here to prevent suppression. For example, as shown above, neither the independent source doctrine nor the inevitable discovery doctrine apply. *Strieff*, 579 U.S. at 238 ("the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source" and "the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source"). The Court finds that evidence seized from the Vehicle (as well as the black holster) derived from the officers' unlawful seizure and, therefore, must be suppressed in accordance with the exclusionary rule. *See Lopez-Arias*, 344 F.3d at 630-31 (affirming the district court's ruling to suppress evidence discovered after unlawful seizure). Additionally, any statements made by Rodgers that were causally connected to the police's seizure of Rodgers are subject to suppression. *Dunaway v. New York*, 442 U.S. 200, 217-19 (1979) (defendant's incriminating statements during detention were suppressed where those statements were causally connected to the unlawful seizure of the

defendant).

### III. <u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Defendant Walter Rodgers' Motion to Suppress Evidence & Statements (Doc. No. 18). Based on the evidence and testimony presented, the Court finds that the police officers unlawfully seized Rodgers, in violation of his Fourth Amendment right, at the time that the officers parked their marked police cruiser behind his vehicle and started to approach that vehicle on foot. The Court **SUPPRESSES** any evidence seized from the Vehicle, the black holster, and any statements that Rodgers made that were causally connected to the police's seizure of Rodgers on November 6, 2021.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, June 22, 2022.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
